**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| EMANUEL WALTON, | : | Civil Action No. 06-2733 (MLC) |
|  | : |  |
| Petitioner, | : | **O P I N I O N** |
|  | : |  |
| v. | : |  |
|  | : |  |
| RONALD H. CATHEL, et al., | : |  |
|  | : |  |
| Respondents. | : |  |

**APPEARANCES:**

EMANUEL WALTON, Petitioner <u>Pro Se</u>, # 419166, SBI# 543783C
New Jersey State Prison, P.O. Box 861, Trenton, N.J. 08625

PATRICIA S. TOREKI, ESQ., Ocean County Prosecutor's Office
Ocean County Courthouse, P.O. Box 2191, Toms River, N.J. 08754
Counsel for Respondents

**COOPER**, District Judge

Petitioner, Emanuel Walton, petitions for habeas corpus relief under 28 U.S.C. § 2254.  The petition will be denied for lack of merit.

### I.   BACKGROUND

**A.   Statement of Facts**

The Court relies on the factual recitations set forth in petitioner's brief on appeal from denial of post-conviction relief ("PCR"), the State's brief responding to petitioner's appeal from denial of his state PCR petition, and the plea transcript of April 6, 2001.  (Ra12; Ra13; and "1T").[1]

---

[1]   Respondents provided the relevant state court record as follows:

Walton met the victim on January 13 or 14, 1999.  (Ra12 at p.5; Ra13 at p.1).  The presentence report relied upon by the trial court states that Walton met the victim as she left a convenience store.  Walton asked the victim for a cigarette, and she told him she had cigarettes in her motel room.  (Ra12 at p.5.)

On arriving at the victim's motel room, Walton began to rub the victim's leg and recalled that he wanted to have sex with her. The victim twice asked Walton to stop touching her and told him to leave when he continued to rub her leg.  (Ra12 at p.5).  At that point, Walton became angry.  (1T 10:1-7; Ra12 at p. 5).  He jumped on top of the victim, pulled a knife and told her to take

---

Ra1   Indictment No. 99-09-1184, dated 9-1-99
Ra2   Plea form, dated 4-14-00
Ra3   Judgment of Conviction, dated 4-27-01
Ra4   Notice of Appeal
Ra5   Appellate Order affirming sentence, dated 12-11-02
Ra6   Pro se petition for post-conviction relief ("PCR"), dated 2-21-03
Ra7   Amended PCR petition, dated 5-11-04
Ra8   Petitioner's PCR brief, dated 5-12-04
Ra9   State's brief in response to PCR petition
Ra10 Order denying PCR petition, dated 8-27-04
Ra11 Petitioner's brief on appeal from denial of state PCR petition, filed 1-19-05
Ra12 State's response brief on appeal from denial of state PCR petition
Ra13 Appellate Division Opinion affirming denial of state PCR petition, dated 11-10-05
Ra14 Supreme Court of New Jersey Order denying certification, filed 2-16-06

"1T" Plea hearing transcript, dated 4-6-01
"2T" Sentencing transcript, dated 4-27-01
"3T" Transcript of Appellate Sentencing Argument, dated 12-10-02
"4T" Transcript of state PCR proceeding, dated 8-20-04

off her clothes.  Walton pulled the victim into the bedroom by her hair and proceeded to choke the victim for a period of twenty minutes until she stopped moving.  (1T 10:8-25; Ra12 at pp.5-6). Realizing the victim was dead, Walton dragged the body onto the floor and attempted to conceal the body with clothing, a blood-stained sheet, and the bed mattress.  (Ra12 at p.6).

Walton took the victim's purse and room key, and locked the motel room door.  He then threw the purse in a dumpster outside the motel, and scattered the contents of the purse in random trash cans.  (Ra12 at p.6.)

Walton then looked for his cousin ("Cousin").  On finding the Cousin's girlfriend, he confessed to her that he had killed someone.  Walton described the murder and his attempt to conceal the body.  He showed the girlfriend the victim's identification, which he had removed from her purse.  (Ra12 at p.6.)

Walton later contacted his Cousin, and again confessed that he had killed a girl in a motel room .  A cousin of the Cousin (1) overheard the confession, and (2) recalled overhearing the Cousin relate Walton's confession while on the phone with the Cousin's brother.  (Ra12 at pp.6-7).

**B.   Procedural History**

Walton was indicted on September 1, 1999 for first degree murder and third degree possession of a knife for an unlawful purpose.  (Ra1).  On April 6, 2001, Walton pled guilty to the

murder charge in exchange for a recommended sentence of 30 years in prison with a 30-year parole disqualifier.  (Ra2; 1T).  Walton was sentenced on April 27, 2001, before the Honorable Judge Peter J. Giovine, J.S.C., to a term of 30 years in prison, without parole, in accordance with the plea agreement.  (2T and Ra3).

Walton appealed his sentence to the New Jersey Appellate Division.  On December 10, 2002, the Appellate Division affirmed the judgment of conviction, finding that the sentence was not excessive or unduly punitive.  (Ra5).

On or before February 21, 2003, Walton filed a pro se petition for post-conviction relief.  (Ra6).  An amended petition with a supporting brief was filed in May 2004.  (Ra7).  A hearing was held before the Honorable James N. Citta, J.S.C., on August 20, 2004.  (4T).  Judge Citta denied post-conviction relief and the request for an evidentiary hearing.  (4T 27:7-45:15).

Walton then appealed from the denial of his PCR petition.  (Ra11).  The Appellate Division affirmed Judge Citta's ruling in a per curiam Opinion.  (Ra13, State v. Walton, 2005 WL 3005693 (N.J. App. Div., Nov. 10, 2005)).  The Supreme Court of New Jersey denied certification on February 16, 2006.  (Ra14).

Walton submitted this petition under 28 U.S.C. § 2254, on or about May 31, 2006.[2]  Respondents answered the petition on April

_____

[2]  Under the "prison mailbox rule," a habeas petition is deemed filed on the date the prisoner delivers it to prison officials for mailing, not the date the petition is ultimately

4

10, 2007, and provided this Court with a copy of the relevant state court record for habeas review on April 12, 2007.

## II.   STATEMENT OF CLAIMS

Walton argues the following:

Ground One: His guilty plea was not knowingly, intelligently, and voluntarily given because he was not correctly informed about his sentence exposure upon conviction.

Ground Two:  Trial counsel was ineffective for failing to request an adjournment of proceedings pending the outcome of State v. Manzie, 168 N.J. 113 (2001).

Ground Three:  Appellate counsel was ineffective for not raising Ground One on direct appeal.

Ground Four:  Trial counsel was ineffective for failing to obtain or request trial judge to obtain petitioner's waiver of the defenses of insanity and diminished capacity.

Ground Five:  Appellate counsel was ineffective in failing to raise the issue that the trial judge did not obtain

---

filed with the court.   See Houston v. Lack, 487 U.S. 266, 270-71 (1988); see also Burns v. Morton, 134 F.3d 109, 112-13 (3d Cir. 1998) (applying Houston prison mailbox rule, which dealt with filing of appeal, to pro se prisoner's habeas petition).   The Court is unable to determine when Walton handed his petition to prison officials for mailing, but Walton signed and dated it on May 31, 2006.   See Henderson v. Frank, 155 F.3d 159, 163-64 (3d Cir. 1998) (using date prisoner signed petition as date he handed it to prison officials for purposes of calculating timeliness of habeas petition).   The Court finds that May 31, 2006, rather than June 16, 2006 (the date the petition was received in the Clerk's office), was the date this petition was filed for purposes of calculating timeliness.

petitioner's waiver of the defenses of insanity and diminished capacity.

Ground Six:  Trial counsel was ineffective in failing to inform petitioner of the viability of the defenses of insanity and diminished capacity for purposes of effecting a knowing and voluntary guilty plea.

Ground Seven:  Trial counsel was ineffective in failing to inform petitioner of the viability of an intoxication defense and that lesser offenses could be charged to the jury.  (Petition, Docket Entry No. 1).

The State argues in response that petitioner's claims are without merit or do not state a cognizable federal claim of a Constitutional violation.  The State also asserts that the petition is time-barred,[3] and that any attack on the sentence is an unexhausted claim.  (Answer, Docket Entry No. 11).

───────────────

[3]  This habeas petition was filed within the one-year statutory time period under 28 U.S.C. § 2244(d)(1), which had been tolled pursuant to 28 U.S.C. § 2244(d)(2).

Petitioner also has exhausted the claims raised here.  To the extent that any of Walton's habeas claims were not exhausted in state court, this Court may deny those habeas claims on the merits despite his failure to exhaust remedies available to him in state court.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); see Duncan v. Walker, 533 U.S. 167, 203 n.6 (2001)(noting under § 2254(b)(2), district court may deny non-exhausted, non-meritorious claims); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003)(same).

### III.   STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Att'y Gen., 878 F.2d 714, 721-22 (3d Cir. 1989).  As Walton is a pro se litigant, the Court will accord his petition the liberal construction intended for pro se petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  See 28 U.S.C. § 2254(e); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996).  Pursuant to Section 2254(d):

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Subsection (d)(1) has two clauses or conditions, one of which must be satisfied before a writ may issue.  The first clause, or

7

condition, is the "contrary to" clause.  The second condition is the "unreasonable application" clause.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  In the "contrary to" clause, "a federal court may grant the writ if the state arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Id</u>.  Under the "unreasonable application" clause, a federal court may grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case."  <u>Id</u>. at 413.  Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  <u>Id.</u> at 411. <u>See Werts v. Vaughn</u>, 228 F.3d 178, 197 (3d Cir. 2000); <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 891 (3d Cir. 1999).

Section 2254(d)(1) requires a federal court to make a two step inquiry of a petitioner's claims.  First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims.  <u>See Werts</u>, 228 F.3d at 196-97; <u>Matteo</u>, 171 F.3d at 888-91.  If the federal court determines that

the state court's decision was not "contrary to" applicable
Supreme Court precedent, then the court takes the second step of
the analysis under § 2254(d)(1), which is whether the state court
unreasonably applied the Supreme Court precedent in reaching its
decision.  Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the
state court's ruling because the Supreme Court would have reached
a different result.  Id.  AEDPA prohibits such de novo review.
Rather, the federal habeas court must determine whether the state
court's application of the Supreme Court precedent was objectively
unreasonable.  Id.  Thus, the federal court must decide whether
the state court's application of federal law, when evaluated
objectively and on the merits, resulted in an outcome that cannot
reasonably be justified under existing Supreme Court precedent.
Id.; see Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Even a summary adjudication by the state court on the merits
of a claim is entitled to § 2254(d) deference.  Chadwick v.
Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002).  As to claims
presented to, but unadjudicated by, the state courts, a federal
court may exercise pre-AEDPA independent judgment.  See Hameen v.
State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000); Purnell v.
Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).

Federal courts must apply a "presumption of correctness to
factual determinations made by the state court."  Id.; see 28

U.S.C. § 2254(e)(1).  This presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence.  See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).  Thus, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

## IV.  ANALYSIS

The Court will examine each of Walton's claims on the merits, pursuant to the standard of review as recited above.

## A.  Guilty Plea

Walton's first claim contends that his guilty plea was not knowingly and intelligently made because he was misinformed about the application of No Early Release Act, ("NERA"), N.J.S.A. § 2C:43-7.2.  At the plea hearing, the trial judge stated:

> COURT: All right, gentlemen.  I haven't gotten into -- because I didn't feel it was appropriate -- I haven't gotten into a discussion of any 85 percent application because, so to speak, that may be up in the air where it deals with murder.
>
> As long as Mr. Walton understands that if he went to trial he could get as much as a life sentence, the way the law stands now, with no parole for at least 30 years.  It could be the worst sentence you got.
>
> Now, it may well be, if you didn't take a plea now, it may well be if you elected to go to trial, if the Supreme Court decides that the 85 percent rule applies in murder cases, you could wind up doing 85 percent of life or 85 percent of 70 years, if that's what the judge orders.  Do you understand that.
>
> DEFENDANT:  Yes, sir.

(1T 8:5-20).

10

This record confirms that the trial court informed Walton that, at the time he was entering his plea, the 85% rule under NERA did not apply to murder cases.  The court expressly noted the worst case scenario Walton would face if he went to trial on the murder charge, that is, Walton "could get as much as a life sentence ... with no parole for at least 30 years."  (1T 8:11-13.)

At the time of Walton's plea, the New Jersey Appellate Division had ruled that the 85% parole bar under NERA did not apply to murder.  State v. Manzie, 335 N.J. Super. 267, 278 (App. Div. 2000).  Also at that time, this issue as to the application of the 85% parole bar to murder cases was certified before the New Jersey Supreme Court.  The New Jersey Supreme Court heard argument in Manzie on March 13, 2001, almost one month before Walton's plea hearing on April 6, 2001.  The New Jersey Supreme Court affirmed the Appellate Division in an opinion rendered on June 13, 2001, finding that the 85% parole bar did not apply to murder cases.  State v. Manzie, 168 N.J. 113 (2001).

On his application for post-conviction relief, Walton alleged that "since [he] was wrongly told that the 85% parole bar pursuant to the former No Early Release Act could apply to a sentence for a murder conviction as a result of trial, his plea was not knowing and voluntary and must be vacated."  (Ra13).  The PCR court determined that Walton was correctly informed as to the status of the law as it existed at the time of his plea hearing.

11

In fact, on appeal from denial of Walton's PCR petition, the Appellate Division found that the PCR court:

> made liberal reference to the transcript of the acceptance of the plea.  He concluded that defendant was correctly advised both of the status of the law as it existed at the time of the plea and of the existence of an appeal then pending before the Supreme Court [of New Jersey] that could increase the time defendant might have to serve before becoming eligible for release. Defendant cannot complain that he received a correct explanation of the law as it then existed and was made aware of a case having the capacity to change that law.

(Ra13).

Guilty pleas must be entered knowingly and voluntarily.  See Boykin v. Alabama, 395 U.S. 238, 242 (1969).  The record must show not only that a defendant was aware of his rights, but also that he "intelligently and understandingly" waived them.  Id.  A guilty plea entered by one fully aware of the direct consequences of the plea is voluntary "unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)."  Brady v. United States, 397 U.S. 742, 755 (1970) (internal quotes and cite omitted).  The only direct consequences relevant to evaluating the voluntariness of a guilty plea are the maximum prison term and fine for the offense charged.  See Parry v. Rosemeyer, 64 F.3d 110, 114 (3d Cir. 1995), cert. denied, 516 U.S. 1058 (1996), superseded by statute on other grounds as stated in Dickerson v.

12

Vaughn, 90 F.3d 87 (3d Cir. 1996).  A guilty plea is intelligently made only if a criminal defendant receives "real notice of the true nature of the charge against him."  Bousley v. United States, 523 U.S. 614, 618 (1998) (internal quotes and cite omitted).

Furthermore:

> no criminal defendant should plead guilty to a crime unless, and until, he has had explained to him and understands all of his constitutional rights and protections, including the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment, the right to a trial by jury, and the right to confront one's accusers.

Hill v. Beyer, 62 F.3d 474, 480 (3d Cir. 1995); see United States v. Peppers, 302 F.3d 120, 135 (3d Cir. 2002) (stating "to be valid [a defendant's] waiver must be made with apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter"); but see United States v. Thomas, 357 F.3d 357, 364 (3d Cir. 2004) (describing same factors as "illustrative examples of factors that courts might discuss, not a mandatory checklist of required topics").

The level of detail in the plea colloquy is not dispositive:

> [T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances-even though the defendant may not know the specific detailed consequences of invoking it. ...  If [the defendant] ...

13

> lacked a full and complete appreciation of all of the
> consequences flowing from his waiver, it does not defeat
> the State's showing that the information it provided to
> him satisfied the constitutional minimum.

Iowa v. Turner, 541 U.S. 77, 92 (2004) (emphasis, internal

quotes, and cite omitted).

The above standards govern the validity of a guilty plea

even when a criminal defendant protests his innocence despite his

entry of a guilty plea.

> [W]hile most pleas of guilty consist of both a waiver of
> trial and an express admission of guilt, the latter
> element is not a constitutional requisite to the
> imposition of criminal penalty [when, as in this case,]
> a defendant intelligently concludes that his interests
> require entry of a guilty plea and the record before the
> judge contains strong evidence of actual guilt.

North Carolina v. Alford, 400 U.S. 25, 37 (1970).  Further,

"[b]ecause of the importance of protecting the innocent and of

insuring that guilty pleas are a product of free and intelligent

choice, various state and federal court decisions properly

caution that pleas coupled with claims of innocence should not be

accepted unless there is a factual basis for the plea and until

the judge taking the plea has inquired into and sought to resolve

the conflict between the waiver of trial and the claim of

innocence."  Id. at 38 n.10 (cites omitted).  Under the holding

in Alford, "there must always exist some factual basis for a

conclusion of guilt before a court can accept an Alford plea."

United States v. Mackins, 218 F.3d 263, 268 (3d Cir. 2000).

Walton does not assert a claim of innocence.  He confirmed his commission of the murder, acknowledging that he ended up in the victim's motel room, became angry with the victim, and choked her until she stopped breathing and moving.  He also admitted that he knew what he was doing at the time and that he was causing the victim pain, but that he continued to choke the victim.  (1T 9:8-11:10.)  There is also a written guilty plea colloquy form, admittedly executed by Walton, which is sufficient proof that Walton was advised of his rights under <u>Boykin</u> before entry of his guilty plea at the April 6, 2001 plea hearing.  <u>See</u> <u>Blackledge v. Allison</u>, 431 U.S. 63, 74 (1977) (execution of guilty plea form carries "strong presumption of verity").

In addition, Walton's argument that he was misinformed about the application of the 85% parole bar is patently false.  The trial court expressly informed petitioner that the 85% parole bar did not apply to murder at the time of the plea hearing.  Walton also was informed that the issue was then pending before the New Jersey Supreme Court.  Thus, his entry into a plea agreement was well-informed.  Any argument now that his counsel or the trial judge may have been wrong to conjecture that the New Jersey Supreme Court would apply the 85% parole bar to murder cases and take a plea while the <u>Manzie</u> case was pending before the New Jersey Supreme Court is simply 20/20 hindsight, or as the PCR court labeled it, "Monday morning quarter backing."  (4T 30:15-18.)

15

The PCR court also commented that Walton's plea agreement was for the minimum permissible sentence under the law for first degree murder, 30 years/serve 30.  The PCR court stated:

> By accepting the plea agreement this defendant guaranteed, guaranteed that at the end of his 30 years he would be released, and had the charge of possession of a weapon dismissed.
>
> Any speculative possibility as to the No Early Release Act that might apply to this case couldn't possibly, in this Court's view, have any effect on the defendant's knowing and voluntary decision to take the plea bargain. It wasn't even part of his contemplation.

(4T 33:12-21.)

The trial court also noted at sentencing that Walton understood his plea, knew that the murder was wrong, and had clearly discussed his "many potential defenses", e.g., substance abuse, and mental health issues, with counsel.  (2T 16:18-17:12.)

As the record does not support any argument that Walton's plea was unknowing and involuntary, this Court finds that Walton's claim under Ground One of his petition is without merit.

## B.  Ineffective Assistance of Trial Counsel

Petitioner asserts several claims of ineffective assistance of counsel against his trial counsel.  These claims are addressed in Ground Two, Ground Four, Ground Six, and Ground Seven.

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  A petitioner

16

seeking to prove a Sixth Amendment violation must show that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  Id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir. 2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Id.  Thus:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (cites omitted); see Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir. 1996).

If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance

actually prejudiced the defense.  Strickland, 466 U.S. at 687.

Prejudice is shown if "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability

is a probability sufficient to undermine confidence in the

outcome."  Id. at 694.  The reviewing court must evaluate the

effect of any errors in light of the totality of the evidence.

Id. at 695-96.  Thus, a petitioner must establish both deficient

performance and resulting prejudice to state an ineffective

assistance of counsel claim.  Id. at 697; see Jacobs, 395 F.3d at

102; Keller, 251 F.3d at 418.

Although this is a high burden for a petitioner to satisfy,

it is even higher for a petitioner proceeding under the AEDPA:

> For [a petitioner] to succeed, ... he must do more than
> show that he would have satisfied Strickland's test if
> his claim were being analyzed in the first instance,
> because under § 2254(d)(1), it is not enough to convince
> a federal habeas court that, in its independent
> judgment, the state-court decision applied Strickland
> incorrectly.  Rather, he must show that the [state
> court] applied Strickland to the facts of his case in an
> objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99 (2002)(internal cite omitted).

### 1.  Counsel Should Have Adjourned Plea Hearing (Ground Two)

Walton first contends that trial counsel was ineffective for

failing to request an adjournment of his case pending the outcome

of State v. Manzie, supra.  Walton raised this claim in his state

PCR proceedings.

The PCR court stated:

> Defendant also argues that trial counsel should have
> requested an adjournment until the Supreme Court decided
> <u>Manzie</u>.  Well, how can we speculate as to whether or not the
> trial court would have even granted the adjournment.  You
> know, it is difficult to put yourselves back in that time
> frame and say, how old is the case?  How many more
> adjournments will there be?  How many status conferences
> have there been?  It is so speculative to say, well, they
> should have requested an adjournment.  Failure to request an
> adjournment is ineffective assistance of counsel?
>
> It could be argued, as Mr. Heisler argued, requesting an
> adjournment and having one granted, if the Supreme Court
> ruled the opposite, would have been a disasterous [sic]
> request.  Highly speculative.
>
> The benefit that this defendant received by entering his
> plea then was not only the minimum sentence but the
> dismissal of an additional charge, which as a matter of law
> doesn't have to merge for sentencing purposes.

(4T 37:10-38:4).

On appeal from denial of the PCR petition, the Appellate

Division affirmed the PCR court for the reasons stated in the

judge's "comprehensive oral opinion of August 20, 2004."  (Ra13).

This Court also finds no merit to Walton's claim that

counsel was ineffective in failing to request an adjournment in

his trial until the New Jersey Supreme Court ruled in <u>Manzie</u>.

There was no way to predict with any degree of certainty how the

state Supreme Court would have ruled on the issue of whether the

85% parole bar applied to murder cases.  In fact, there was an

equal chance that the state Supreme Court would have applied the

85% parole bar to murder cases, and this result would have been

extremely detrimental to Walton in getting the best terms for his

plea bargain.  Walton's argument presumes trial counsel to have
had the benefit of 20/20 hindsight, which is not required in the
wide range of reasonable professional assistance contemplated
under Strickland.  Indeed, "[a] fair assessment of attorney
performance requires that every effort be made to eliminate the
distorting effects of hindsight".  Strickland, 466 U.S. at 689.

This Court also finds that Walton has not demonstrated any
prejudice, i.e., if counsel sought an adjournment, the result of
the proceedings would have been different.  Strickland, 466 U.S.
at 687, 694.  Walton received the absolute minimum permissible
sentence for murder under the New Jersey statute, 30 years in
prison without parole.  The weapon possession charge was also
dismissed.  This sentence was the best Walton could have received
under the law at that time.  Thus, there is no prejudice to
Walton, even if the matter had been adjourned because the status
of the law did not actually change; the New Jersey Supreme Court
held that the 85% parole bar did not apply to murder, which was
the status of the law at the time Walton had his plea hearing.

This Court therefore finds no merit to the claim of
ineffective assistance of trial counsel.  This Court further
finds that decisions of the state PCR court and Appellate
Division were not contrary to federal law established in
Strickland.  The PCR court carefully set forth and discussed the
two-part test under Strickland, and ultimately determined that

petitioner could not meet either the performance prong or the prejudice prong.  (4T 35:11-36:23.)  Walton also has not shown that the state PCR court decision, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891.  The argument that trial counsel should have adjourned the proceedings is without merit.

### 2.  Insanity and Diminished Capacity Defenses

In Ground Four and Ground Six, Walton makes a two-fold argument.  First, Walton claims that trial counsel was ineffective in failing to obtain, or request the trial judge to obtain his waiver of the insanity and diminished capacity defenses at the plea hearing.  The second part contends that trial counsel was ineffective in failing to inform Walton of the viability of these defenses.

On direct appeal, appellate counsel for petitioner raised the question as to whether Walton had the proper state of mind at the time he committed the murder.  Counsel argued that, based on several psychiatric and psychological exams, if Walton did not knowingly or purposely commit the crime, there is no factual basis for the plea and the plea should be withdrawn.  (3T 104:17-105:12).  The appellate court affirmed the sentence without elaboration in an Order dated December 10, 2002.

On state PCR review, petitioner argued that counsel should have obtained, or had the trial judge obtain, from petitioner a

waiver of the insanity and diminished capacity defenses.  The PCR

court found:

> Question is whether or not the trial court —- the issue is
> with regard to, required to obtain a waiver of psychiatric
> defenses and failure to do so in this case is not error, or
> is error.  The defense cites State v. Conn [sic], 175 N.J.
> Super. 72 (Appellate Division 1980),[4] which quoted and
> suggested the procedure of Fendack [sic] v. U.S.,[5] "whenever
> evidence suggests a substantial" —- I'm not going to read
> the whole quote, gentleman [sic].
>
> It is this Court's view that both Conn and Fendack are
> distinguishable from this case in that they involved
> instances where the defendant went to trial and refused an
> insanity defense and the court interposed an insanity
> defense despite the defendant's objection.  These cases do
> not apply, in this Court's opinion, to the case at bar.
>
> This is not a case where the defendant chose to go to trial
> and refused to put forth an insanity defense.  This [is] a
> case that involves a plea of guilty to murder, which the
> trial court found to be knowing and voluntary.
>
> The procedure outlined in Fendack [sic] and adopted by Conn
> does not apply to the facts in this case.  The procedure is
> to protect the defendant's rights to waive a defense when
> the court wishes to impose the defense and say that it
> should be used.

---

[4]   State v. Khan, 175 N.J. Super. 72 (App. Div. 1980).  In
Khan, the defendant had several hearings on his competency to
stand trial and a further hearing to inquire as to his decision
to waive an insanity defense at trial.  An insanity defense was
to be interposed despite defendant's objection.  The court stated
that a hearing on the waiver of an insanity defense must
determine whether the defendant made a knowing, intelligent, and
voluntary waiver.  The Appellate Division further commented that
a court has the discretion to raise an insanity defense sua
sponte only if it is determined that defendant has not made a
knowing, intelligent and voluntary waiver.  Id., 175 N.J. Super.
at 81.

[5]   Frendak v. United States, 408 A.2d 364 (D.C. Court of
Appeals, 1979) (held that a trial court may not force an insanity
defense on a defendant competent to stand trial if defendant
intelligently and voluntarily decides to forego an insanity
defense).

Recognizing that a defendant may have a compelling reason to forego a defense of insanity, <u>Conn</u> [sic] said at 81, the trial court is not required to obtain a waiver of insanity defense in order to accept a plea that is determined to be knowing and voluntary.

Further, the defendant also admitted, as pointed out by the prosecutor, in his presentence interview that he lied to the psychiatrist that had been evaluating him in an attempt to receive a lighter sentence.  He further stated that he now accepts his punishment and is feeling remorseful.

I think it is further important to note, as the prosecutor pointed out, while there is no Certification from Mr. Venturi [defense counsel], it is important to note there are substantial visits and conferences between Mr. Venturi and his client before, during and after the evaluations and the reports by all three of the doctors.

Mr. Venturi immediately got involved in having doctors retained to do the evaluations of Mr. Walton.  And for him to claim now that his counsel failed to discuss the experts' reports and failed to inform him he could present an insanity defense and, therefore, his plea was not knowing and voluntary is the only proof that's offered here and it wasn't done.

The defendant's statement by itself placed on the record does not make it so, and does not establish a prima facie case of ineffective assistance of counsel.

(4T 38:5-40:9).

This Court finds that the state court record shows that Walton understood that an insanity defense was available.  His attorney had arranged psychological and psychiatric evaluations before a plea was given.  Moreover, Walton's admission in the presentence interview confirms that he voluntarily pled guilty and used the insanity issue to obtain a more lenient sentence.

This Court also finds that trial counsel was not ineffective for failing to obtain a waiver of the insanity defenses before the trial court accepted petitioner's guilty plea.  Nor was the

23

trial court required to obtain a waiver of an insanity defense. The state court did not err in distinguishing Walton's case from the state cases of <u>Khan</u> and <u>Frendak</u>, which involved a completely different issue, namely, defendants who refused an insanity defense but the court interposed an insanity defense over defendants' objections.

In fact, Walton fails to show any error of federal constitutional dimension as to his claim that the trial court did not obtain a waiver of the insanity defense before accepting his knowing and voluntary guilty plea.  The state court ruling on this issue was not contrary to, and did not involve an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts presented in the state court proceedings.  Accordingly, this claim of ineffective assistance of counsel will be denied.

Walton also argues that trial counsel was ineffective by failing to inform him of the viability of the insanity defenses. The record shows this contention to be without merit.  Trial counsel arranged for Walton to be interviewed by three psychiatrists on many occasions.  Counsel was present at one evaluation.  Respondents show that there were at least 44 meetings between Walton and his trial counsel for a total of 49 hours.

In rejecting this argument in Walton's state PCR proceedings, the PCR court found:

... it is important to note there are substantial visits and conferences between Mr. Venturi [defense counsel] and his client before, during and after the evaluations and the reports by all three of the doctors.

Mr. Venturi immediately got involved in having doctors retained to do the evaluations of Mr. Walton.  And for him to claim now that his counsel failed to discuss the experts' reports and failed to inform him he could present an insanity defense and, therefore, his plea was not knowing and voluntary is the only proof that's offered here that it wasn't done.

The defendant's statement by itself placed on the record does not make it so, and does not establish a prima facie case of ineffective assistance of counsel.

This Court has looked at and reviewed these doctor's reports.  It is difficult to ascertain, unequivocally, that these doctors concluded that there was a viable insanity or even diminished capacity defense available.  Dr. Cook does say his condition at the time and his substance abuse and his polysubstance abuse would have affected his ability to control his emotions.  But in our law that is not an insanity defense or even a diminished capacity defense.

Judge Giovine made a finding in the sentencing that it was clear his attorney discussed with him many potential defenses in this case and so on and so forth.  It is clear, and I am satisfied by his clear recollection of what occurred, what he did, why he did it, that he knew exactly what he was doing and capable of thinking and capable of forming purpose.  And he did it.  End quote from Judge Giovine.

These findings after the plea colloquy with the defendant and conferencing the case, statujsing [sic] the case many times, and being intimately involved in the preparation of the doctor's reports, even to the point where the judge was even involved in having the defendant, by court order, taken from the Ocean County Jail to have an EEG and MRI performed so that the doctors could properly have additional information to them in making their assessment as to any physical or psychological, mental disease or defect.

. . .

The records show that counsel explored the mental functioning of the defendant thoroughly, immediately and with zeal.  There is nothing in this file that demonstrated that the defendant was not informed of any and all possible defenses.  In fact, this is corroborated by the defendant's statement in the presentence report that he intentionally

> lied in an attempt to manipulate the psychiatrists and the
> psychologists that were making his mental evaluation.
>
> . . .
>
> I've stated before and I will reiterate, the defendant has
> not provided any proofs to the contention that he was not
> informed of defenses.  In fact, the record shows, and the
> information before this Court submitted in the addendums to
> these memorandums, as well as the file in its entirety, the
> fact that defense counsel was with the defendant during
> evaluation of psychiatrist Dr. Glass, time records of Ronald
> Venturi reveal there were 44 meetings between him and the
> defendant for a total of 49 and a half hours.  The only
> reasonable and logical inference that this Court can draw
> was that counsel was in communication with his client about
> reviewing discovery, doctors' reports, and any and all
> possible defenses.

(4T 39:19-41:20).

The PCR court ultimately determined that Walton failed to provide any evidence that he was not informed of possible viable insanity defenses by trial counsel, except for his unsubstantiated declaration that counsel did not do so.  Consequently, the court found that petitioner had not established a prima facie case under State v. Preciose, 129 N.J. 451 (1982), and was not entitled to a plenary hearing.  (4T 42:13-43:6; 43:21-25.)

Based on the record, this Court finds that Walton has failed to establish either the deficient performance or prejudice prong under Strickland.  The state court carefully followed and applied the established federal law under Strickland, and made a thoroughly reasonable determination of the facts presented in the state PCR proceedings.  Therefore, this Court finds no merit to petitioner's claim that trial counsel was ineffective in failing to inform him of possible viable insanity defenses.

### 3.  Intoxication Defense and Lesser Offenses (Ground Seven)

Walton's last claim regarding ineffective assistance of trial counsel concerns his contention that counsel failed to inform him of the viability of an intoxication defense or that lesser included offenses could be charged to a jury.  This claim is presented in Ground Seven of the petition.

Respondents argue that Walton's claim as to the viability of an intoxication defense is based only on his self-serving statement in his presentence interview.  A presentence report was prepared after Walton had entered a guilty plea, and Walton confirms therein that he had lied to the psychiatrists to obtain a lesser sentence, thus straining any credibility about an intoxication defense.

Walton raised this particular ineffective assistance of counsel claim in his state PCR proceedings.  The PCR court expressly rejected petitioner's claim:

> Finally, I don't believe trial counsel was ineffective for failing to advise the defendant about other possible defenses and lesser included offenses.  The same analysis of Strickland v. Washington and State v. Fritz applies.
>
> Defense counsel mentions specifically intoxication and other trial strategy and the possible of lesser included offenses of aggravated manslaughter and reckless manslaughter.  Here, again, the only evidence of this -- of these contentions is defendant's Petition.
>
> As for any intoxication defense, the only evidence of intoxication by the defendant is his statement that he had been drinking, sharing a 30-pack of beer and fifth of Bacardi and smoking crack all day with [the Cousin].  However, this flies in the face of the other evidence in the case, and the information available by investigators, statements made by

defendant on the date and time, observations by all police officers involved in the investigation. And further corroborated in the presentence report where the defendant acknowledges that he lied to the psychiatrist for the sole purpose of manipulating their reports.

There is no evidence that counsel did not discuss any of these options with the defendant, nor is there any evidence that he would not have accepted -- would not have accepted the plea agreement, nor is there any evidence under any circumstances that the prosecutor would have offered any other plea bargain.

He was indicted for and charged with murder. The Grand Jury did not consider and return a true bill of indictment for aggravated manslaughter. Aggravated manslaughter is not, as a matter of law, automatically a lesser included offense of knowing and purposeful murder. And only in those cases where the facts warrant the charge of such a lesser included offense would it be given at trial. Those facts are not shown to be present here. And application for post conviction relief is denied.

(4T 44:1-45:15).

The PCR court thus found no deficient performance by trial counsel on this claim. Specifically, the court rejected Walton's claim as not credible, and based on evidence in the record, the court concluded that all other viable defenses and lesser included offenses were discussed by trial counsel.

This Court must apply a presumption of correctness to the state court's factual determinations, 28 U.S.C. § 2254(e)(1), which can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)). Walton has failed to rebut the state court's factual finding with any evidence to the contrary, other than a self-serving statement.

Walton also has not shown that the state court decision, when evaluated objectively and on the merits, resulted in an

outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891.  Nor was the state court ruling contrary to established federal law set forth in Strickland.  Therefore, this claim will be denied for lack of merit.

## C.  Ineffective Assistance of Appellate Counsel

Walton asserts that his appellate counsel was ineffective in failing to raise on direct appeal that his guilty plea was not knowingly, intelligently and voluntarily made because he was not correctly informed about his sentence exposure at the plea hearing.  (Petition, Ground Three).  Walton also asserts that appellate counsel failed to raise the issue that the trial judge did not obtain his waiver of an insanity defense and a diminished capacity defense before accepting the guilty plea.  (Id., Ground Five).

The Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right.  Evitts v. Lucey, 469 U.S. 387 (1985).  Claims of ineffective assistance of appellate counsel are evaluated under Strickland.  See Smith v. Robbins, 528 U.S. 259, 285 (2000); Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004); United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002).  Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may show that appellate counsel was constitutionally

ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994).

To prevail on a claim that appellate counsel was ineffective, a petitioner must show not only that counsel's performance fell below an objective standard of reasonableness, but also that there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal.  <u>See</u> <u>Buehl v. Vaughn</u>, 166 F.3d 163, 173-74 (3d Cir. 1999).

Because the underlying claims that Walton alleges should have been raised by appellate counsel were determined to be without substantive merit, <u>see</u> Opinion at §§ IV.A. and IV.B.2, this Court likewise finds no merit to Walton's claim that appellate counsel was ineffective in failing to raise these arguments on direct appeal.  Counsel is not expected to raise frivolous arguments on appeal.  Walton also has not shown that these claims would have been successful had they been presented by appellate counsel on direct appeal.

Based on review of the record, this Court finds that Walton fails to establish ineffective assistance of appellate counsel because he cannot show that a different outcome would have resulted on appeal if counsel had raised the arguments he

suggests.  Further, there is no showing that appellate counsel was deficient in failing to raise these claims.  Therefore, Walton's claims of ineffective assistance of appellate counsel will be denied.

## V.   CERTIFICATE OF APPEALABILITY

This Court must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if a petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by Walton demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## VI.   CONCLUSION

This Court finds that the § 2254 habeas petition should be dismissed on the merits and a certificate of appealability will not issue.  The Court will issue an appropriate order and judgment.

　　　　　　　　　　　　　　　s/ Mary L. Cooper
　　　　　　　　　　　　　　**MARY L. COOPER**
　　　　　　　　　　　　　　United States District Judge

**Dated:** October 30, 2007

31